**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICHARD DENT; JEREMY NEWBERRY;
ROY GREEN; J. D. HILL; KEITH VAN
HORNE; RON STONE; RON
PRITCHARD; JAMES MCMAHON;
MARCELLUS WILEY; JONATHAN REX
HADNOT, JR., On Behalf of
Themselves and All Others Similarly
Situated,

*Plaintiffs-Appellants*,

v.

NATIONAL FOOTBALL LEAGUE, a
New York unincorporated
association,

*Defendant-Appellee.*

No. 15-15143

D.C. No.
3:14-cv-02324-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted December 15, 2016
San Francisco, California

Filed September 6, 2018

Before:  Richard C. Tallman,[*] Jay S. Bybee,
and N. Randy Smith, Circuit Judges.

Opinion by Judge Tallman

**SUMMARY**[**]

**Labor Law**

The panel reversed the district court's dismissal on preemption grounds of an action alleging a variety of state-law claims brought against the National Football League ("NFL") by former professional football players, and remanded for further proceedings.

The putative class of retired NFL players alleged that the NFL distributed controlled substances and prescription drugs to its players in violation of both state and federal laws, and that the manner in which these drugs were administered left the players with permanent injuries and chronic medical conditions.

The panel held that the district court erred in holding that the players' claims were preempted by § 301 of the Labor Management Relations Act.  The panel held that as pled, the

[*] Judge Tallman was drawn to replace Circuit Judge Alex Kozinski when Judge Kozinski retired.  Judge Tallman has read the briefs and viewed the digital recording of oral argument.  The panel has also reconferenced on the case.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

players' claims neither arose from collective bargaining agreements ("CBA") nor required their interpretation. Specifically, the panel held that plaintiffs' negligence claim regarding the NFL's alleged violation of federal and state laws governing controlled substances was not preempted by § 301. The panel also held that the players' negligent hiring and retention claims, and their negligent misrepresentation claim, were not preempted because they could be evaluated without interpreting the CBAs. The panel further held that the NFL had not identified any CBA provisions that must be interpreted in order to resolve the players' fraud claims, and resolving those claims did not require interpreting CBA provisions.

The panel held that the players' loss of consortium claim, and their requests for declaratory judgment and medical monitoring were derivative of their other claims. Because those claims were not preempted, the panel reversed the dismissal of the derivative claims and remanded.

The panel rejected the NFL's argument that the dismissal should be affirmed on the ground that the players failed to exhaust the grievance procedures required by the CBAs.

## COUNSEL

Phillip J. Closius (argued), Andrew G. Slutkin, Steven D. Silverman, Stephen G. Grygiel, and William N. Sinclair, Silverman Thompson Slutkin & White, Baltimore, Maryland; Mark J. Dearman and Stuart Andrew Davidson, Robbins Geller Rudman, Boca Raton, Florida; for Plaintiffs-Appellants.

Paul D. Clement (argued), Washington, D.C.; Daniel Nash, Stacey R. Eisenstein, James E. Tysse, Marla S. Axelrod, and Elizabeth England, Akin Gump Strauss Hauer & Feld LLP, Washington, D.C.; Rex S. Heinke and Gregory W. Knopp, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; Allen J. Ruby, Jack P. DiCanio, and Timothy A. Miller, Skadden Arps Slate Meagher & Flom LLP, Palo Alto, California; for Defendant-Appellee.

## OPINION

TALLMAN, Circuit Judge:

This appeal requires us to decide whether a variety of state-law claims brought against the National Football League (NFL) by former professional football players are preempted by § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 141.

The district court held that the players' claims are preempted and dismissed their suit. We disagree. As pled, the players' claims neither arise from collective bargaining agreements (CBAs) nor require their interpretation. Therefore, we reverse and remand for further proceedings.

I

The NFL is an unincorporated association of thirty-two independently owned and operated football "clubs," or teams. The NFL "promotes, organizes, and regulates professional football in the United States," *Williams v. Nat'l Football League*, 582 F.3d 863, 868 (8th Cir. 2009), but it

does not employ individual football players; they are employees of the teams for whom they play.

Richard Dent is a retired football player who played on four different NFL teams during his fourteen-year career. During that time, doctors and trainers allegedly gave him "hundreds, if not thousands" of injections and pills containing powerful painkillers in an effort to keep him on the field. According to Dent, he was never warned about the potential side effects or long-term risks of the medications he was given, and he ended his career with an enlarged heart, permanent nerve damage in his foot, and an addiction to painkillers.

Since 1968, the NFL, its member teams, and NFL players have been bound by a series of CBAs[1] negotiated by the NFL Players' Association (the players' bargaining unit) and the NFL Management Council (the teams' bargaining unit).[2] Since 1982, the CBAs have included provisions regarding "players' rights to medical care and treatment." Those provisions have changed somewhat over the years, but generally speaking, they have required teams to employ board-certified orthopedic surgeons and trainers who are certified by the National Athletic Trainers Association, and they have guaranteed players the right to access their medical records, obtain second opinions, and choose their own surgeons. The CBAs impose certain disclosure requirements on team doctors; for example, the 1982 CBA

---

[1] There have been two periods of time when a CBA was not in force: from August 1987 to March 1993, and from March 2011 to August 2011. Those gaps in CBA coverage are irrelevant to this action.

[2] Until 2011, the NFL itself was not a signatory to the CBAs. However, even prior to 2011, the CBAs were binding on all the relevant entities, including the NFL.

established that "[i]f a Club physician advise[d] a coach or other Club representative of a player's physical condition which could adversely affect the player's performance or health, the physician [would] also advise the player." The 1993 CBA added the requirement that "[i]f such condition could be significantly aggravated by continued performance, the physician [would] advise the player of such fact in writing." The 2011 CBA established that team physicians "are required to disclose to a player any and all information about the player's physical condition" that the physicians disclose to coaches or other team representatives, "whether or not such information affects the player's performance or health."

In 2014, Dent and nine other retired players filed a putative class action suit against the NFL in the Northern District of California, seeking to represent a class of more than 1,000 former players. They alleged that since 1969, the NFL has distributed controlled substances and prescription drugs to its players in violation of both state and federal laws, and that the manner in which these drugs were administered left the players with permanent injuries and chronic medical conditions.

Like Dent, the other named plaintiffs allege that during their years in the NFL, they received copious amounts of opioids, non-steroidal anti-inflammatory medications, and local anesthetics. The complaint claims the NFL encouraged players to take these pain-masking medications to keep players on the field and revenues high, even as the football season got longer and the time between games got shorter, increasing their chances of injury. According to the players, they "rarely, if ever, received written prescriptions . . . for the medications they were receiving." Instead, they say they were handed pills in "small manila envelopes that often had

no directions or labeling" and were told to take whatever was in the envelopes. During their years of consuming these powerful medications, it is further alleged that no one from the NFL warned them about potential side effects, long-term risks, interactions with other drugs, or the likelihood of addiction. The plaintiffs claim that as a result of their use (and overuse) of these drugs, retired players suffer from permanent orthopedic injuries, drug addictions, heart problems, nerve damage, and renal failure.

Each team hires doctors and trainers who attend to players' medical needs. Those individuals are employees of the teams, not the NFL. But the players' Second Amended Complaint (SAC) asserts that the NFL itself directly provided medical care and supplied drugs to players. For example, the SAC alleges that:

- "The NFL directly and indirectly supplied players with and encouraged players to use opioids to manage pain before, during and after games in a manner the NFL knew or should have known constituted a misuse of the medications and violated Federal drug laws."

- "The NFL directly and indirectly administered Toradol on game days to injured players to mask their pain."

- "The NFL directly and indirectly supplied players with NSAIDs, and otherwise encouraged players to rely upon NSAIDs, to manage pain without regard to the players' medical history, potentially fatal drug interactions or long-term health consequences of that reliance."

- "The NFL directly and indirectly supplied players with local anesthetic medications to mask pain and other symptoms stemming from musculoskeletal injury when the NFL knew that doing so constituted a dangerous misuse of such medications."

- "NFL doctors and trainers gave players medications without telling them what they were taking or the possible side effects and without proper recordkeeping.  Moreover, they did so in excess, fostering self-medication."

- "[M]edications are controlled by the NFL Security Office in New York . . . ."

- "The NFL made knowing and intentional misrepresentations, including deliberate omissions, about the use and distribution of the Medications."

The named plaintiffs sought to represent a class of plaintiffs who had "received or were administered" drugs by anyone affiliated with the NFL or an NFL team.  They filed claims for negligence per se, negligent hiring and retention, negligent misrepresentation, fraudulent concealment, fraud, and loss of consortium.  They sought relief including damages, injunctive relief, declaratory relief, and medical monitoring.

The NFL filed two motions to dismiss, one arguing that the players' claims were preempted by § 301 of the LMRA and the other arguing that the players failed to state a claim and their claims were time barred.  The district court held a hearing on the preemption issue.  It granted the NFL's motion to dismiss on preemption grounds and denied the NFL's other motion to dismiss as moot.  The players timely appealed.

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's finding of preemption under § 301. *Cramer v. Consol. Freightways, Inc.*, 255 F.3d 683, 689 (9th Cir. 2001), *as amended* (Aug. 27, 2001).

## II

Section 301 of the LMRA is a jurisdictional statute that has been interpreted as "a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032 (9th Cir. 2016) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985)). Congress intended for § 301 to "protect the primacy of grievance and arbitration as the forum for resolving CBA disputes and the substantive supremacy of federal law within that forum." *Alaska Airlines Inc. v. Schurke*, — F.3d —, No. 13-35574, 2018 WL 3636431, at *7 (9th Cir. Aug. 1, 2018) (en banc) (emphasis omitted). Accordingly, § 301 preempts state-law claims "founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'"[3] *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987) (quoting *Int'l Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)). Conversely, claims are not preempted where the rights at issue are "conferred by state law, independent of the CBAs" and "the matter at hand can be

---

[3] Section 301 preemption has a long history, which we will not fully recount here. An interested reader may refer to our opinions in *Kobold*, 832 F.3d 1024, *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053 (9th Cir. 2007), and *Cramer*, 255 F.3d 683, for more information on the history of the LMRA and the development of the preemption doctrine.

resolved without interpreting the CBAs." *Burnside*, 491 F.3d at 1058.

We conduct a two-step inquiry to determine whether state-law claims are preempted by § 301. First, we ask whether the cause of action involves "rights conferred upon an employee by virtue of state law, not by a CBA." *Id.* at 1059. If the rights at issue "exist[] solely as a result of the CBA, then the claim is preempted, and our analysis ends there." *Id.*

Second, if the right exists independently of the CBA, we "ask whether litigating the state law claim nonetheless requires interpretation of a CBA, such that resolving the entire claim in court threatens the proper role of grievance and arbitration." *Schurke*, 2018 WL 3636431, at *8. A claim that requires interpretation of a collective bargaining agreement is preempted. *Burnside*, 491 F.3d at 1059–60. "'Interpretation' is construed narrowly; it means something more than 'consider,' 'refer to,' or 'apply.'" *Schurke*, 2018 WL 3636431, at *8. (quotation omitted). At this second step, "claims are only preempted to the extent that there is an active dispute over the meaning of contract terms. A *hypothetical* connection between the claim and the terms of the CBA is not enough to preempt the claim . . . ." *Id.* (quotations omitted).

"The plaintiff's claim is the touchstone" of the § 301 preemption analysis; "the need to interpret the CBA must inhere in the nature of the plaintiff's claim." *Cramer*, 255 F.3d at 691. Therefore, a defense based on a CBA does not give rise to preemption. *Caterpillar*, 482 U.S. at 300. Moreover, "a CBA provision does not trigger preemption when it is only *potentially* relevant to the state law claims, without any guarantee that interpretation or direct reliance on the CBA terms will occur." *Humble v. Boeing Co.*,

305 F.3d 1004, 1010 (9th Cir. 2012). Rather, "adjudication of the claim must require interpretation of a provision of the CBA." *Cramer*, 255 F.3d at 691–92.

Merely consulting a CBA (to, for example, calculate damages or ascertain that an issue is not addressed by the CBA) does not constitute "interpretation" of the CBA for preemption purposes. *See Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994); *Cramer*, 255 F.3d at 693. Similarly, "[t]he need for a purely factual inquiry" that "does not turn on the meaning of any provision of a collective bargaining agreement . . . is not cause for preemption" under § 301. *Burnside*, 491 F.3d at 1072 (quotation omitted); *see also Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988) ("Each of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer. Neither of the elements requires a court to interpret any term of a collective-bargaining agreement.").

In sum, for each of the players' claims, we must determine whether the claim arises from the CBAs and, if not, whether establishing the elements of the claim will require interpretation of the CBAs. *Burnside*, 491 F.3d at 1059–60. Because this case was decided on a motion to dismiss, as we perform this analysis we must take the SAC's allegations as true and construe them in the light most favorable to the plaintiffs. *See, e.g.*, *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017). We must also be mindful of the fact that the "LMRA § 301 forum preemption inquiry is not an inquiry into the merits of a claim; it is an inquiry into the claim's 'legal character'—whatever its merits—so as to ensure it is decided in the proper forum." *Schurke*, 2018 WL 3636431, at *10 (quoting *Livadas*, 512 U.S. at 123–24). Therefore, "[o]ur only job is to decide whether, as pleaded, the claim in this case is 'independent'

of the CBA in the sense of 'independent' that matters for preemption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement.'" *Id.* (alteration omitted) (quoting *Lingle*, 486 U.S. at 407).

## A

To state a claim for negligence in California,[4] a plaintiff must establish the following elements: (1) the defendant had a duty, or an "obligation to conform to a certain standard of conduct for the protection of others against unreasonable risks," (2) the defendant breached that duty, (3) that breach proximately caused the plaintiff's injuries, and (4) damages. *Coarles v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (quoting *McGarry v. Sax*, 70 Cal. Rptr. 3d 519, 530 (Ct. App. 2008)).

The plaintiffs have styled their negligence claim as one for "negligence per se," but under California law, negligence per se is a doctrine, not an independent cause of action. *Quiroz v. Seventh Ave. Ctr.*, 45 Cal. Rptr. 3d 222, 144–45 (Ct. App. 2006). Therefore, we construe the players' claim as a traditional negligence claim, but apply the negligence per se doctrine.

Under that doctrine, a statute may establish the standard of care. Therefore, the defendant's violation of a statute can give rise to a presumption that it failed to exercise due care if it "violated a statute, ordinance, or regulation of a public entity," that violation proximately caused an injury, the

---

[4] Because plaintiffs seek to represent a nationwide class but have not identified the specific states whose laws govern their claims, we follow the district court in applying California law for illustrative purposes.

injury "resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent," and the person who suffered the injury "was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." Cal. Evid. Code § 699(a); *see also Elsner v. Uveges*, 102 P.3d 915, 927 (Cal. 2004). Many state and federal laws govern the administration of controlled substances to alleviate pain.

The players argue that they were injured by the NFL's "provision and administration" of controlled substances without written prescriptions, proper labeling, or warnings regarding side effects and long-term risks, and that this conduct violated the Controlled Substances Act, 21 U.S.C. § 801 *et seq.*; the Food, Drugs, and Cosmetics Act, 21 U.S.C. § 301 *et seq.*; and the California Pharmacy Laws, Cal. Bus. & Prof. Code § 4000 *et seq.*

The district court believed that the "essence" of the plaintiffs' negligence claim "is that the individual clubs mistreated their players and the league was negligent in failing to intervene and stop their alleged mistreatment." However, as we read the complaint, the plaintiffs are not merely alleging that the NFL failed to prevent medication abuse by the teams, but that the NFL *itself* illegally distributed controlled substances, and therefore its actions directly injured players. The SAC alleges that the NFL "directly and indirectly supplied players" with drugs. It also alleges that the NFL implemented a "League-wide policy" regarding Toradol, that "medications are controlled by the NFL Security Office in New York," that "the NFL coordinat[ed] the illegal distribution of painkillers and anti-inflammatories for decades," and that "NFL doctors and

trainers" gave players medications "without telling them what they were taking or the possible side effects."**[5]**

With that reading of the complaint in mind, we turn to the question whether the plaintiffs' negligence claim is preempted.

The first question is whether the right at issue—the players' right to receive medical care from the NFL that does not create an unreasonable risk of harm—arises from the CBAs. *See Burnside*, 491 F.3d at 1059. It does not. The CBAs do not require the NFL to provide medical care to players, and the players are not arguing that they do. They are not arguing that the NFL violated the CBAs at all, but that it violated state and federal laws governing prescription drugs.

The next question is whether the plaintiffs' claim nevertheless requires interpretation of the CBAs. *See id.* To answer it, we ask whether the plaintiffs can make out each element of a prima facie case for negligence without interpretation of the CBA.

As for the first element, "[a] duty of care may arise through statute or by contract." *J'Aire Corp. v. Gregory*, 598 P.2d 60, 62 (Cal. 1979). It may also be based on "the general character of the activity in which the defendant engaged." *Id.* California courts consider several factors when deciding whether a duty exists, including

---

**[5]** The NFL argues that the doctors and trainers who actually provided medications to players were employees of the teams, not the NFL. But at this stage of the litigation, we must take the allegations in the SAC as true. *See Kwan*, 854 F.3d at 1096.

the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Regents of Univ. of Cal. v. Superior Court*, 413 P.3d 656, 670 (Cal. 2018) (quoting *Rowland v. Christian*, 443 P.2d 561, 564 (Cal. 1968)).  These factors "must be evaluated at a relatively broad level of factual generality."  *Id.* (quotation omitted).

Here, any duty to exercise reasonable care in the distribution of medications does not arise through statute or by contract; no statute explicitly establishes such a duty, and as already noted, none of the CBAs impose such a duty.  However, we believe that a duty binding on the NFL—or any entity involved in the distribution of controlled substances—to conduct its activities with reasonable care arises from "the general character of [that] activity."  *See J'Aire Corp.*, 598 P.2d at 62.  Applying the *Rowland* factors, lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them.  That's why they're "controlled" in the first place—overuse or misuse can lead to addictions and long-term health problems.  *See, e.g.*, 21 U.S.C. §§ 801(2), 812.  These types of injuries can be

established with certainty, and they are closely connected to the misuse of controlled substances.

Carelessness in the handling of dangerous substances is both illegal and morally blameworthy, given the risk of injury it entails. Imposing liability on those involved in improper prescription-drug distribution will prevent harm by encouraging responsible entities to ensure that drugs are administered safely. And it will not represent an undue burden on such entities, which should already be complying with the laws governing prescription drugs and controlled substances. Thus, we conclude that to the extent the NFL is involved in the distribution of controlled substances, it has a duty to conduct such activities with reasonable care.

Of course, establishing that an entity owes a duty does not necessarily establish what standard of care applies, or whether it was breached. But when it comes to the distribution of potentially dangerous drugs, minimum standards are established by statute. The Controlled Substances Act, 21 U.S.C. § 801 *et seq.*; the Food, Drugs, and Cosmetics Act, 21 U.S.C. § 301 *et seq.*; and the California Pharmacy Laws, Cal. Bus. & Prof. Code § 4000 *et seq.*, set forth requirements governing how drugs are to be prescribed and labeled.[6] 21 U.S.C. §§ 331, 352, 353(b)(1), 825, 829. Therefore, under the plaintiffs' negligence per se theory, whether the NFL breached its duty to handle drugs with reasonable care can be determined by comparing the conduct of the NFL to the requirements of the statutes at

---

[6] The NFL argues that these statutes do not apply to the NFL. But this argument goes to the merits of the plaintiffs' negligence per se theory and not to § 301 preemption. We need not and do not consider it here.

issue. There is no need to look to, let alone interpret, the CBAs.

As for causation, whether the NFL's alleged violation of the statutes caused the plaintiffs' injuries is a "purely factual question[]" that "do[es] not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'" *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 261 (1994) (quoting *Lingle*, 486 U.S. at 407).

The Eighth Circuit reached a similar conclusion in *Williams*, 582 F.3d 863. There, NFL players who had been suspended after testing positive for a banned substance brought a variety of claims against the NFL, including common-law claims and a state-law claim based on a Minnesota statute governing drug testing. *Id.* at 872–73. The NFL argued that all the claims were preempted by § 301, but the Eighth Circuit held that the statutory claim was not preempted, because "a court would have no need to consult the [CBA] in order to resolve the Players' [statutory] claim." *Id.* at 876. Instead, "it would compare the facts and the procedure that the NFL actually followed with respect to its drug testing of the Players with [the statute's] requirements." *Id.* Similarly, here, a court would have no need to consult the CBAs to resolve the plaintiffs' negligence claim. Instead, it would compare the NFL's conduct with the requirements of state and federal laws governing the distribution of prescription drugs.

We recognize that the Eighth Circuit held that the *Williams* plaintiffs' common-law claims, including a negligence claim, were preempted by § 301. *Id.* at 881–82. But that negligence claim is distinguishable from the claim here. There, the plaintiffs argued that the NFL was negligent because it failed to warn players that a certain supplement contained a banned substance. *Id.* at 881. But the players

had procured the supplements on their own; in fact, they were taking supplements *against* the advice of the NFL. *Id.* at 869. The Eighth Circuit held that under these circumstances, determining whether the NFL had a duty to warn players about the supplement would require "examining the parties' legal relationship and expectations as established by the CBA and the [Drug] Policy," which explicitly stated that players who took supplements did so "at [their] own risk." *Id.* at 869, 881.

Here, on the other hand, no examination of the CBAs is necessary to determine that distributing controlled substances is an activity that gives rise to a duty of care. The NFL has a duty to avoid creating unreasonable risks of harm when distributing controlled substances that is completely independent of the CBAs. Therefore, unlike in *Williams*, no CBA interpretation is required to determine whether the NFL owed the players a duty and whether it breached that duty.[7]

---

[7] The NFL also points to *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170 (11th Cir. 2010). There, the Eleventh Circuit held that a negligence claim arising from the NFL's vetting of financial advisors was preempted by § 301. But in *Atwater*, the NFL's duty to perform such vetting arose from the CBA itself, so the claim was preempted at the first step of the *Burnside* analysis. *See id.* The Eleventh Circuit did go on to say that even if the duty at issue had not arisen from the CBA, it would "still have to consult the CBA to determine the scope of the legal relationship between Plaintiffs and the NFL and their expectations based upon that relationship." *Id.* at 1182. But in that case, the CBA explicitly stated that players were "solely responsible for their personal finances," *id.* at 1181; interpreting that provision would be necessary to establishing the scope of the NFL's duty. Here, there is no analogous CBA provision that must be interpreted in order to establish the scope of the NFL's duty as it concerns the provision of prescription drugs to players.

The NFL argues that to determine what duty, if any, it owed plaintiffs, a court must "interpret the CBAs to determine the scope of the obligations the NFL and Clubs have adopted vis a vis the individual clubs' physicians and trainers." Similarly, the district court noted that the CBAs place medical disclosure obligations "squarely on Club physicians, not on the NFL." But the *teams'* obligations under the CBAs are irrelevant to the question of whether the *NFL* breached an obligation to players by violating the law. The parties to a CBA cannot bargain for what is illegal. *Allis-Chalmers*, 471 U.S. at 212; *see also Cramer*, 255 F.3d at 695. Therefore, liability for a negligence claim alleging violations of federal and state statutes does not turn on how the CBAs allocated duties among the NFL, the teams, and the individual doctors. Regardless of what (if anything) the CBAs say about those issues, if the NFL had any role in distributing prescription drugs, it was required to follow the laws regarding those drugs. To the extent that the plaintiffs allege they were injured by the NFL's violation of those laws, their claims can be assessed without any interpretation of the CBAs.

The district court also stated that the negligence claim was preempted because "in deciding whether the NFL has been negligent . . . it would be necessary to consider the ways in which the NFL has indeed stepped forward and required proper medical care," i.e., the provisions of the CBAs that establish minimum standards for the medical care teams provide to players. We are not so sure. The negligence analysis is not an equation, whereby one careless act can be canceled out by a careful act in a related arena—especially when the careful act is to be performed by a different party. In other words, the fact that the CBAs require *team* doctors to advise players in writing if a medical condition "could be significantly aggravated by continued

performance" does not address the *NFL's* liability for injuring players by illegally distributing prescription drugs.

We express no opinion regarding the merits of the plaintiffs' negligence claim, which will require the players to establish that the relevant statutes apply to the NFL, the NFL violated those statutes, and the alleged violations caused the players' injuries. Perhaps plaintiffs can prove these elements; perhaps not. That must await completion of discovery. We hold only that the plaintiffs' negligence claim regarding the NFL's alleged violation of federal and state laws governing controlled substances is not preempted by § 301.

We do note that at many points in the SAC, the plaintiffs appear to conflate the NFL and the teams. But the plaintiffs are pursuing a theory of direct liability, not vicarious liability. And they have attempted to vindicate virtually identical claims against the clubs themselves in separate litigation.[8] Therefore, on remand, any further proceedings in this case should be limited to claims arising from the conduct of the NFL and NFL personnel—not the conduct of individual teams' employees. We leave it to the district

---

[8] *See Evans v. Arizona Cardinals Football Club, LLC*, No. C 16-01030, 2016 WL 3566945 (N.D. Cal. July 1, 2016) (holding that players' claims against teams were not preempted by § 301, and denying teams' motion to dismiss); *Evans v. Arizona Cardinals Football Club, LLC*, 252 F. Supp. 3d 855 (N.D. Cal. May 15, 2017) (granting teams' motion to dismiss players' amended complaint as to certain claims, and granting summary judgment for teams on some remaining claims); *Evans v. Arizona Cardinals Football Club, LLC*, 262 F. Supp. 3d 935 (N.D. Cal. July 21, 2017) (granting summary judgment for teams on all remaining claims), *appeal docketed*, No. 17-16693 (9th Cir. 2017).

court to determine whether the plaintiffs have pleaded facts sufficient to support their negligence claim against the NFL.

## B

Ordinarily, "[a]n employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit." *Phillips v. TLC Plumbing, Inc.*, 91 Cal. Rptr. 3d 864, 868 (Cal. Ct. App. 2009) (quotation omitted). To establish liability, a plaintiff must demonstrate the familiar elements of negligence: duty, breach, proximate causation, and damages. *Id.* There are "two elements necessary for a duty to arise in negligent hiring and negligent retention cases—the existence of an employment relationship *and* foreseeability of injury." *Id.* at 870–71 (quoting *Abrams v. Worthington*, 861 N.E.2d 920, 924 (Ohio Ct. App. 2006)).

The SAC alleges that "NFL doctors and trainers gave players medications without telling them what they were taking or the possible side effects and without proper recordkeeping." It also alleges that the NFL hired individuals "charged with overseeing, evaluating, and recommending changes to distribution of Medications," and that the NFL knew or should have known that those individuals were incompetent. As a result, the players say they were "deceived about the nature and magnitude of the dangers to which they were subjected by the Medications" and ultimately injured.

If the NFL did in fact hire doctors and trainers to treat players, or hire individuals to oversee the league's prescription-drug regime, there is clearly an employment relationship between the NFL and those individuals. Injury arising from their incompetence is foreseeable, given the dangers associated with controlled substances. *See*

21 U.S.C. §§ 801(2), 812. Therefore, to the extent that the NFL employed such individuals, it had a common-law duty to use reasonable care in hiring and retaining them.

That duty did not arise from the CBAs, which do not require the NFL to hire employees to treat players or oversee the distribution of medications. Nor does determining whether the NFL breached that duty require interpreting the CBAs, which—because they do not require the NFL to hire such employees in the first place—do not specify any qualifications for them. Thus, the plaintiffs' negligent hiring and retention claims are not preempted by § 301. *See Burnside*, 491 F.3d at 1059; *Ward v. Circus Circus Casinos, Inc.*, 473 F.3d 994, 999 (9th Cir. 2007) (holding plaintiff-employees' negligent hiring, training, and supervision claims were not preempted because they did "not invoke or refer to any duty arising from the CBA" and did not require interpretation of the CBA).

The NFL has not identified CBA provisions whose interpretation would be *required* in order to adjudicate the negligent hiring and retention claims. *See Cramer*, 255 F.3d at 691–92. The NFL argues, and the district court held, that a court could not assess these claims without interpreting various CBA provisions regarding medical care, including the requirement that each team retain a "board-certified orthopedic surgeon" and that all full-time trainers be "certified by the National Athletic Trainers Association." But those provisions relate to the *teams*' obligations, not the NFL's.

We recognize that it is not entirely clear that the NFL *did* hire doctors, trainers, or individuals to supervise medications. The complaint provides very little detail about the employees who were purportedly "charged with overseeing" medication distribution, and the SAC is devoid

of any allegation of an agency relationship that would render the NFL liable for the conduct of particular doctors who treated specific players.

But if the plaintiffs have failed to make the factual allegations necessary to support their claim, that is a pleading problem, not a preemption problem. The issue in this appeal is not whether plaintiffs have plausibly pled the NFL's liability, but whether plaintiffs' claims *as pled* are preempted. *See Schurke*, 2018 WL 3636431, at \*10. We hold that the players' negligent hiring and retention claims are not preempted, because they can be evaluated without interpreting the CBAs.

## C

To state a claim for negligent misrepresentation, a plaintiff must allege "[m]isrepresentation of a past or existing material fact, without reasonable ground for believing it to be true, and with intent to induce another's reliance on the fact misrepresented; ignorance of the truth and justifiable reliance on the misrepresentation by the party to whom it was directed; and resulting damage." *Shamsian v. Atlantic Richfield Co.*, 132 Cal. Rptr. 2d 635, 647 (Ct. App. 2003). As with all negligence claims, "responsibility for negligent misrepresentation rests upon the existence of a legal duty . . . owed by a defendant to the injured person." *Eddy v. Sharp*, 245 Cal. Rptr. 211, 213 (Ct. App. 1988).

The plaintiffs argue that the NFL "continuously and systematically" misrepresented the risks associated with the medications at issue, that they reasonably relied on those misrepresentations, and they were injured as a result.

As we have said, none of the CBA provisions address the NFL's responsibilities with regard to the distribution of

prescription drugs. Thus, any duty the NFL had to act with reasonable care when making representations regarding the medications arises from state law, not the CBAs. Therefore, the question is whether assessing the plaintiffs' negligent misrepresentation claim will require interpretation of the CBAs. *See Burnside*, 491 F.3d at 1059. We hold that it will not.

Whether the NFL made false assertions, whether the NFL knew or should have known they were false, whether the NFL intended to induce players' reliance, and whether players justifiably relied on the NFL's statements to their detriment, are all factual matters that can be resolved without interpreting the CBAs. *See Galvez v. Kuhn*, 933 F.2d 773, 778 (9th Cir. 1991) ("[T]he question in this case is simply a factual issue and one of intent . . . . Interpretation of the CBA can hardly help resolve these factual questions."). As for the NFL's duty, if the players are correct that the NFL directly supplied drugs to them, then the NFL certainly owed them a duty to exercise reasonable care when making representations about those drugs. *See Shamsian*, 132 Cal. Rptr. 2d at 647; *see also Garcia v. Superior Court*, 789 P.2d 960, 964 (Cal. 1990) (holding that although a parole officer had no duty to make disclosures about the dangerousness of a parolee, once he chose to do so, he "had a duty to use reasonable care").

The NFL argues that assessing the scope of the NFL's duty would require interpreting CBA provisions related to medical care, including those that give players the right to access medical facilities, view their medical records, and obtain second opinions. But these provisions do not relate to the *NFL's* duty to use reasonable care when making representations about the safety of medications.

The NFL also argues that it is impossible to assess whether the plaintiffs reasonably relied on the NFL's representations without interpreting CBA provisions related to team doctors' disclosure obligations. But California law does not require a detailed weighing of various parties' disclosure responsibilities to determine whether reliance was justified; the question is whether the "circumstances were such to make it reasonable for [the plaintiffs] to accept [the defendants'] statements without an independent inquiry or investigation." *See Goodwardene v. ADP, LLC*, 209 Cal. Rptr. 3d 722, 744 (Ct. App. 2016) (quoting *OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 835, 864 (Ct. App. 2007)). Plaintiffs are denied recovery for lack of justifiable reliance "only if [their] conduct is manifestly unreasonable in the light of [their] own intelligence or information." *OCM Principal*, 68 Cal. Rptr. 3d at 865 (quotation marks and citation omitted). We need only "look to" the CBAs to determine that none of them contain any provisions that would render reliance on the NFL's representations regarding prescription drugs manifestly unreasonable. *See Cramer*, 255 F.3d at 692.

We acknowledge that two of our sister circuits have held misrepresentation claims by NFL players preempted because determining whether players' reliance was reasonable would require interpreting the CBAs. *See Williams*, 582 F.3d at 881; *Atwater*, 626 F.3d at 1183. But in both of those cases, specific provisions in the CBAs arguably rendered the players' reliance on the NFL's representations unreasonable, which meant that interpretation of the CBAs would be required to assess the plaintiffs' claims.

In *Atwater*, players brought claims based on the NFL's alleged negligence in conducting background checks on

potential financial advisers. 626 F.3d at 1174–75. But the CBA provision that dealt with the relevant program explicitly stated that players were "solely responsible for their personal finances." *Id.* at 1181. The Eleventh Circuit held that determining whether the plaintiffs' reliance on the NFL's representations was reasonable would require interpreting that particular provision. *Id.* at 1182.

In *Williams*, players argued that the NFL owed them a duty to disclose that a certain dietary supplement contained a banned substance, even though the NFL itself "strongly encourage[d] [players] to avoid the use of supplements altogether." 582 F.3d at 869, 881. But the NFL's drug policy, which had been incorporated into the CBA, stated that "if you take these products, you do so AT YOUR OWN RISK!" and that "a positive test result will not be excused because a player was unaware he was taking a Prohibited Substance." *Id.* at 868. The Eighth Circuit stated that the reasonableness of the players' reliance on the absence of a warning about the supplement could not "be ascertained apart from [those] terms of the Policy." *Id.* at 882.

Here, unlike in *Atwater* or *Williams*, no CBA provisions directly address the subject of the litigation: who was responsible for disclosing the risks of prescription drugs provided to players by the NFL. In *Atwater* and *Williams*, the nature of the claims and the content of the CBAs meant that adjudicating the claim would require interpreting the CBAs. But here, no provisions of the CBAs even arguably render the players' reliance on the NFL's purported representations unreasonable.[9] Therefore, interpretation of

---

[9] The only possible exception to this statement is a disclaimer in the 2011 CBA which states that nothing in the agreement should "be deemed to impose or create any duty or obligation upon either the League or the

the CBAs will not be required, and the negligent misrepresentation claim is not preempted.

## D

The elements of fraud are (1) misrepresentation; (2) knowledge of falsity; (3) "intent to defraud, i.e., to induce reliance;" (4) justifiable reliance; and (5) resulting damage. *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 917 (Cal. 1997). The elements of fraudulent concealment are "(1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact to the plaintiff; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would not have acted as he or she did if he or she had known of the concealed or suppressed fact; and (5) plaintiff sustained damage as a result of the concealment or suppression of the fact." *Hambrick v. Healthcare Partners Med. Grp., Inc.*, 189 Cal. Rptr. 3d 31, 60 (Ct. App. 2015).

The players can establish each of these elements without relying on the CBAs. The SAC alleges that "[t]he NFL knew, or should have known, that its provision and administration of Medications . . . created a substantial risk

---

[players' union] regarding diagnosis, medical care and/or treatment of any player." But the plaintiffs assert claims arising between 1969 and 2012, and the 2011 CBA provision would apply to only a sliver of those claims. Moreover, if the NFL undertook to provide direct medical care and treatment to players, as the plaintiffs allege, then the disclaimer— which only states that nothing *in the CBA* should be interpreted as giving rise to duties regarding medical care—would not relieve the NFL of its duty not to misrepresent the effects of the drugs it was giving to players. *Cf. Cramer*, 255 F.3d at 697 ("Because a CBA cannot validly sanction illegal action, we hold the terms of the CBA were irrelevant to plaintiffs' claim.").

of causing addictions and related physical and mental health problems." It also alleges that the NFL intentionally withheld this information from players with the intent to deceive them.

The NFL has not identified any CBA provisions that must be interpreted in order to resolve the players' fraud claims. As with the negligent misrepresentation claim, the NFL argues that assessing whether the NFL had a duty to make disclosures, and whether the players reasonably relied on the NFL's representations, would require interpreting CBA provisions requiring team doctors to make certain disclosures. But as explained above, because the players' claims are about the NFL's conduct, resolving these claims does not require interpreting CBA provisions regarding *team* doctors' disclosure obligations.

E

The players' loss of consortium claim, as well as their requests for declaratory judgment and medical monitoring, are derivative of their other claims. Because we hold that their claims are not preempted, we reverse the district court's dismissal of the derivative claims and remand.

F

The NFL argues that we should affirm the dismissal of all claims on the ground that the players failed to exhaust the grievance procedures required by the CBAs. For more than forty years, each CBA has included provisions that require players to follow certain dispute-resolution procedures for "[a]ny dispute . . . involving the interpretation or application of, or compliance with, provisions of [the CBA]."

However, the players are not arguing that the NFL failed to comply with the terms of the CBA. Nor do their claims require the interpretation or application of the CBAs, for the reasons already described. Therefore, we reject the NFL's argument that we should affirm the dismissal of the plaintiffs' claims on this ground.

## III

Preemption under § 301 "extends only as far as necessary to protect the role of labor arbitration in resolving CBA disputes." *Schurke*, 2018 WL 3636431, at *1. As pled, the players' claims do not constitute a dispute over the rights created by, or the meaning of, the CBAs. Their claim is that when the NFL provided players with prescription drugs, it engaged in conduct that was completely outside the scope of the CBAs. The meaning of CBA terms governing team doctors' disclosure obligations, the qualifications of team medical personnel, and players' rights to obtain second opinions or examine their medical records is simply irrelevant to the question of whether the NFL's conduct violated federal laws regarding the distribution of controlled substances and state law regarding hiring, retention, misrepresentation, and fraud. Therefore, no interpretation of the terms of the CBAs is necessary, and there is no danger that a court will impermissibly invade the province of the labor arbitrator. *See id.* at *8.

We express no opinion about the ultimate merits of the players' claims. They may be susceptible either to a motion for a more definite statement under Rule 12(e) or a motion to dismiss for failure to state a claim under Rule 12(b)(6), and they may not survive summary judgment under Rule 56. But the fact that the claims may have been inadequately pled is not a reason for finding them preempted. The complaint alleges claims that do not arise from the CBAs and do not

require their interpretation. Therefore, they are not preempted by § 301.

Each party shall bear its own costs.

**REVERSED and REMANDED.**